WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )     10-04256MP-001-PCT-MEA
                                 )
       v.                        )     Citation No. F3999985
                                 )
JAMES T. SMITH,                  )          ORDER
                                 )
            Defendant.           )
_____)

         Before the Court is Defendant's Motion to Dismiss.
Defendant was cited for failure to pay a recreation fee, in
violation of 36 C.F.R. § 261.17, a misdemeanor infraction for
which the maximum fine is $100 for a first offense.[1]

    **I Standard for granting or denying a motion to dismiss
a criminal charge**

         Federal Rule of Criminal Procedure 12(b)(2) provides
"[a] party may raise by pretrial motion any defense, objection,
or request that the court can determine without a trial of the
general issue." Fed. R. Crim. P. 12(b)(2) (2010). A charge may
be dismissed if it is subject to a defense that may be decided
solely on issues of law. Cf. United States v. Flores, 404 F.3d
320, 324 (5th Cir. 2005); United States v. Labs of Va., Inc.,

─────────────────────

         [1] Congress created the crime of failure to pay a recreation fee
in 16 U.S.C. § 6811 and established varying penalties for violation
of the statute. The Forest Service has by regulation created a
parallel crime in 36 C.F.R. § 261.17, which duplicates section
6811(d).

272 F. Supp. 2d 764, 768 (N.D. Ill. 2003) (in the context of a motion to dismiss an indictment). See also United States v. Marzook, 426 F. Supp. 2d 820, 823-24 (N.D. Ill. 2006); United States v. Bodmer, 342 F. Supp. 2d 176, 180 (S.D.N.Y. 2004). Arguments raised in a motion to dismiss that rely on disputed facts should be denied. See United States v. Caputo, 288 F. Supp. 2d 912, 916 (N.D. Ill. 2003), citing United States v. Shriver, 989 F.2d 898, 906 (7th Cir. 1992).

**II Background**

On November 2, 2009, a United States Department of Agriculture National Forest Service officer patrolling the Vultee Arch Trailhead parking area placed a citation on a parked, unoccupied vehicle registered to Mr. Smith. The citation was for failure to display a "Red Rock Pass" or other pass indicating Mr. Smith had paid a required recreational fee, in violation of 36 C.F.R. § 261.17. Mr. Smith and the government agree, for the purpose of deciding the motion to dismiss, that he parked his truck at the parking area for the Dry Creek Trail, near the Vultee Arch Trailhead, and that he backpacked overnight in an undeveloped location and camped overnight, accessing that area via the trail, and that he returned to find the citation on his vehicle. This is Mr. Smith's first prosecution for this offense.

The relevant section of the Code of Federal Regulations was promulgated in 2005, and provides: "Failure to pay any recreation fee is prohibited. Notwithstanding 18 U.S.C. 3571(e), the fine imposed for the first offense of nonpayment shall not exceed $100." The Federal Lands Recreation

Enhancement Act ("FLREA"), enacted in late 2004, provides: "The failure to pay a recreation fee established under this Act shall be punishable as a Class A or Class B misdemeanor, except that in the case of a first offense of nonpayment, the fine imposed may not exceed $100, notwithstanding section 3571(e) of Title 18, United States Code."   16 U.S.C. § 6811(d) (2000 & Supp. 2010).   The term "recreation fee" includes a standard amenity recreation fee. See id. § 6801(8).

Mr. Smith asserts the requirement that he pay to park at an undeveloped trailhead and to hike and camp at undeveloped locations is void because it is ultra vires,[2] i.e., beyond the authority given to the Forest Service by Congress.   Mr. Smith contends requiring him to buy a Red Rock Pass to park at the Vultee Arch Trailhead and to hike the Dry Creek Trail contradicts the FLREA's proscription of charging any fee for parking or access.   Mr. Smith further argues that, because the site where he parked does not contain the amenities required by the FLREA of "areas" where an amenity fee may be charged, the requirement that he pay the Red Rock Pass fee at the Vultee Arch Trailhead parking lot is not authorized by the FLREA.   Defendant also asserts the Forest Service's interpretation of the Federal Lands Recreation Enhancement Act, as evidenced by the Interim Guidelines promulgated to authorize the fee he is accused of failing to pay, would not put a reasonable person on notice that their actions violated the regulation requiring payment of a

---

[2] "Unauthorized; beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary (8th Ed. 2004).

fee, subjecting them to criminal charges.[3]

In its opposition to Defendant's motion to dismiss the government states the Forest Service may charge an amenity fee at the Vultee Arch Trailhead parking area because the agency has interpreted the FLREA as allowing the agency to combine or include sites that do not have the required amenities with sites that do have the required amenities to create an "area" where an amenity fee may be collected.

### III Relevant statutory and regulatory scheme

A summary of the evolution of public lands recreation fees is helpful to understanding and resolving the issues pending before the Court.

### A. The Recreational Fee Demonstration Program

As a result of the Land and Water Conservation Fund Act of 1965, for the first time Congress permitted federal land-management agencies to charge the public a fee for recreating on federal lands; however the fee was authorized only when certain

---

[3] A similar recreation fee was the subject of a civil suit seeking a declaratory judgment that the fee charged by the Forest Service at the site at issue in that suit was ultra vires of the Federal Lands Recreation Enhancement Act, the same claim made in this matter in a criminal, rather than a civil context.  See Adams v. United States Dep't of Agr., CV 08 00283 TUC RCC.  The plaintiffs in that suit argued the requirement that they pay a fee for recreating within the Mt. Lemmon High Impact Recreation Area on the Coronado National Forest violated their constitutional rights and the Administrative Procedures Act. The plaintiffs argued the fee provision violated their right to travel and their right to due process.  The suit was dismissed on March 9, 2010, pursuant to Rule 12(b), Federal Rules of Civil Procedure, and an appeal has been filed in the Ninth Circuit Court of Appeals.  (Court of Appeals Docket No. 10-16711). Notably, two of the plaintiffs in Adams were individuals who had previously been cited for failure to pay a recreation fee.  See United States v. Wallace, 476 F. Supp. 2d 1129 (D. Ariz. 2007).  In Adams their claims were dismissed as barred because these plaintiffs had raised the claims in their criminal cases.

facilities were provided by the agency to the public. This situation remained the status quo for thirty years.

In 1996 the United States Congress enacted the "Recreational Fee Demonstration Program." Pub. L. No. 104-134, § 315, 110 Stat. 1321 ("Fee Demo Program"). The Fee Demo Program legislation required the Forest Service and three other federal land-management agencies to develop a pilot program to "charge and collect fees for ... [the] use of outdoor recreation sites." Pub. L. No. 104-134, § 315(a) & (b)(1). Congress instructed the Forest Service to "carry out this section without promulgating regulations." Id. § 315(e), (f).

The Fee Demo Program legislation permitted the subject land-management agencies, including the Forest Service, to charge fees for the use of basic facilities, such as parking lots at trailheads, for the first time.[4] It was anticipated by Congress that the fee demonstration sites or areas would be large campgrounds or complexes, visitor centers, watersheds or natural areas, and could include an entire administrative unit if division into smaller units would be difficult to administer. See United States v. Morow, 185 F. Supp. 2d 1135, 1139 (E.D. Cal. 2002). Congress' stated purpose in enacting the Fee Demo Program was to shift more of the operations costs of public

---

[4] In 2005 the section of the Code of Federal Regulations replaced by 36 C.F.R. § 261.17 was found at section 261.15 and this section provided: "Failing to pay any fee established for admission or entrance to or use of a site, facility, equipment or service furnished by the United States is prohibited. The maximum fine shall not exceed $100." 36 C.F.R. § 261.15 (2005). In 2006 section 261.15 was revised to govern the use of vehicles off-road and the section criminalizing the failure to pay a fee was codified at section 261.17. The Court notes that promulgation of section 261.17 excluded references to admission fees or fees for the use of a site, facility, or service.

lands onto the agencies managing those lands, and also to address the need for funds to reduce an acknowledged and extensive public lands maintenance backlog.   The Fee Demo Program provided that eighty percent of the generated revenue would be returned to the national parks, national forests, and other public lands where the fees were collected.   Pub. L. No. 104-134 § 315(c)(1)(A) & (c)(2)(A).

In the Red Rock Ranger District of the Coconino National Forest the Fee Demo Program resulted in the requirement that visitors to the National Forest purchase and display a "Red Rock Pass".   The Fee Demo Program was avidly disliked by some sectors of the public and numerous individuals throughout the country charged with failing to pay the fee challenged their citations in the federal magistrate judge courts.   See, e.g., Kira Dale Pfisterer, *Foes of Forest Fees: Criticisms of the Recreation Fee Demonstration Project at the Forest Service*, 22 J. Land Resources & Envtl. L. 309, 340-42 (2002); Brandon C. Marx, *Why Not Make It Voluntary? Controversy Over the Recreation Fee Demonstration Program*, 17 J. Envtl. L. & Litig. 423, 423-27 & 435-36 (2002).   However, the validity of charging fees for "recreating" in and parking on the National Forests, pursuant to the Fee Demo Program, were regularly upheld by the federal courts.   See United States v. Dahl, 314 F.3d 976 (9th Cir. 2002); Morow, 185 F. Supp. 2d at 1138-39 (finding a defendant who hiked into a recreational fee area and camped could be required to pay a user fee); United States v. Siart, 178 F. Supp. 2d 1171 (D. Or. 2001) (concluding a parking fee could be a valid recreational user fee).

1        **B. The Federal Lands Recreation Enhancement Act**

2        On December 8, 2004, Congress passed the Federal Lands

3   Recreation Enhancement Act (FLREA), as part of the 2005

4   Consolidated Appropriations Act.   <u>See</u> Pub. L. No. 108-447, §

5   801, 118 Stat. 2647.   Perhaps most notably, the FLREA

6   specifically repealed the Fee Demo Program, <u>id.</u>, § 813(b), and

7   accordingly, any federal land user fee authorized by the Fee

8   Demo Program was no longer authorized by Congress.   <u>See</u> 16

9   U.S.C. §§ 6802(a) & 6812(b) & (e)(3).

10       The FLREA authorized the Secretary of the Department of

11  Agriculture, i.e., the Forest Service, to establish, charge, and

12  collect recreation fees on the National Forests in certain

13  circumstances.  The agency's power to establish fees was limited

14  to establishing regulations in accordance with criteria set

15  forth in the FLREA, including the following:

16               (1) the amount of the recreation fee must be
                 commensurate with the benefits and services
17               provided to the visitor;
                 (2) the Secretary must consider the aggregate
18               effect of recreation fees on recreation uses
                 and recreation service providers;
19               (3) the Secretary must consider comparable
                 fees charged elsewhere by other public
20               agencies and by nearby private sector
                 operators;
21               (4) the Secretary must consider the public
                 policy or management objectives served by the
22               recreation fee;
                 (5) the Secretary must obtain input from
23               Recreation Resource Advisory Committees
                 established by the FLREA; and
24               (6) the Secretary must consider other factors
                 or criteria that he or she determines are
25               appropriate.

26  16 U.S.C. § 6802(b) (2000 & Supp. 2010).

27       The FLREA mandates the Secretary of Agriculture to

28  provide the public with opportunities to participate in the

development of recreation fees established pursuant to the authority granted by the legislation. <u>Id.</u> at §§ 6802(b)(5) & 6803(a).[5] The FLREA directs the Secretary to establish the minimum number of recreation fees and to avoid the collection of multiple or layered recreation fees for similar uses, activities, or programs. <u>Id.</u> at § 6802(c).

The FLREA distinguishes among several different kinds of recreation fees. One type of allowable fee is an entrance fee, which may be charged only to enter onto lands managed by the National Park Service or the Fish and Wildlife Service. Although the FLREA authorizes the Secretary of the Interior to charge an entrance fee for any unit of the National Park system, the statute specifically prohibits the federal government from charging an entrance fee for recreational use of lands managed by the Bureau of Land Management ("BLM"), the Bureau of Reclamation ("BOR"), or the Forest Service.

A second kind of fee authorized by the FLREA is a "standard amenity recreation fee," which is a recreation fee charged for lands and waters under the jurisdiction of the BLM, the BOR, or the Forest Service. The FLREA allows a recreation fee to be assessed only at certain specific sites or sites providing specified amenities, which amenities are listed in the act.[6]

---

[5] 16 U.S.C. § 6802(b)(5) states: "The Secretary <u>shall</u> obtain input from the appropriate Recreation Resource Advisory Committee, as provided in section 6803(d) of this title." (emphasis added).

[6] The FLREA also provides the agencies may establish an "expanded amenity recreation fee," i.e., a recreation fee that may be charged either in addition to one of the other two kinds of fees or by itself. The NPS and the FWS may charge an expanded amenity recreation fee

Finally, the FLREA allows the Secretaries of Interior and Agriculture to charge a fee for an interagency national pass known as the "America the Beautiful—the National Parks and Federal Recreational Lands Pass," which covers the entrance fee and standard amenity fee for all federal recreational lands and waters at which those fees are charged.

Under the FLREA, a standard amenity recreation fee may be charged for federal recreation lands that qualify as an "area". To qualify as an "area" the site must "provide[] significant opportunities for outdoor recreation; ... [have] substantial Federal investments," and provide specific "amenities," including a toilet facility, a permanent trash receptacle, interpretive signs, picnic tables, and "security services." Id. at § 6802(f).

The FLREA specifically restricts the authority of the federal land management agencies to charge fees in certain instances. See id. at § 6802(d). The Secretary of Agriculture may not charge a standard amenity recreation fee or expanded amenity recreation fee for recreational lands administered by the Forest Service for a variety of specific uses. The specific uses for which no amenity fee may be charged include parking, general access, dispersed areas with low or no investment,

---

where the charged visitor uses a specific or specialized facility, equipment, or service. The BLM and the Bureau of Reclamation may charge an expanded amenity recreation fee only for the use of facilities or services listed in the statute. These include use of developed campgrounds, highly developed boat launches, various kinds of rentals, utilities hookups, sanitary dump stations, interpretive programs, etc. A fourth kind of fee is a "special recreation permit fee," which the NPS or the USFS may charge in connection with issuance of a permit for specialized recreation uses of the federal lands, including group activities or recreation events.

access across federal recreational lands and waters without using facilities and services, camping at undeveloped sites, and the use of overlooks or scenic pullouts.[7] <u>Id.</u> at § 6802(d)(1). "FLREA's legislative history indicates that Congress was concerned that the Forest Service would attempt to charge an entrance fee for access onto federal recreation lands where federal services are not provided...." <u>United States v. Wallace</u>, 476 F. Supp. 2d 1129, 1132 (D. Ariz. 2007).

The Secretaries of the Department of the Interior and the Department of Agriculture are responsible for enforcing payment of recreation fees authorized by the FLREA. As stated supra, the failure to pay a recreation fee is punishable as a

---

[7] The text of the statute provides:
The Secretary shall not charge any standard amenity recreation fee or expanded amenity recreation fee for Federal recreational lands and waters administered by the Bureau of Land Management, the Forest Service, or the Bureau of Reclamation under this chapter for any of the following:
(A) Solely for parking, undesignated parking, or picnicking along roads or trailsides.
(B) For general access unless specifically authorized under this section.
(C) For dispersed areas with low or no investment unless specifically authorized under this section.
(D) For persons who are driving through, walking through, boating through, horseback riding through, or hiking through Federal recreational lands and waters without using the facilities and services.
(E) For camping at undeveloped sites that do not provide a minimum number of facilities and services as described in subsection (g)(2)(A) of this section.
(F) For use of overlooks or scenic pullouts.
(G) For travel by private, noncommercial vehicle over any national parkway or any road or highway established as a part of the Federal-aid System, as defined in section 101 of Title 23, which is commonly used by the public as a means of travel between two places either or both of which are outside any unit or area at which recreation fees are charged under this chapter.
16 U.S.C. § 6802(d)(1) (2000 & Supp. 2010).

1    federal misdemeanor.   See 16 U.S.C. § 6811(d) (2000 & Supp.

2    2010); 36 C.F.R. § 261.17 (2010).    The authority granted

3    pursuant to the FLREA terminates ten years after the statute's

4    date of enactment.

5                **C. Forest Service action implementing FLREA**

6                Approximately four months after the FLREA was enacted,

7    on April 25, 2005, the Forest Service issued "Federal Lands

8    Recreation   Enhancement   Act   (REA)   Interim   Implementation

9    Guidelines" ("Interim Guidelines"), to ensure that existing

10   recreation fee projects, presumably the projects that had been

11   authorized by the Fee Demo Program, conformed to the

12   requirements of the FLREA. See Motion to Dismiss, Exh. M.[8]  The

13   Interim Guidelines provide for charging a recreation fee for

14   "high-impact recreation areas" ("HIRA"s) that meet all

15   requirements in the FLREA for where an amenity fee may be

16   charged.

17               Under the Interim Guidelines, a HIRA is "described" as:

18               a clearly delineated, contiguous area with
                 specific, tightly defined boundaries and
19               clearly defined access points (such that
                 visitors can easily identify the fee area
20               boundaries on the ground or on a map/sign);
                 that supports or sustains concentrated
21               recreation use; and that provides
                 opportunities for outdoor recreation that are
22               directly associated with a natural or
                 cultural feature, place, or activity (i.e.,
23               waterway, canyon, travel corridor, geographic
                 attraction, the recreation attraction).

24

25   _____

26         [8]  The document states: "Fee authority is critical to the
     sustainability of quality Forest Service recreation programs.
27   Conscientious, consistent, and conservative implementation of REA will
     protect this authority and demonstrate the agency's ability to meet
28   expectations of the general public and Congress." Motion to Dismiss,
     Exh. M at 4.

1   Motion to Dismiss, Exh. M at 9.[9]

2          The Interim Guidelines also mandate that a HIRA provide

3   the six required amenities specified by the FLREA, i.e.,

4   parking, a toilet, a trash receptacle, signs, a table, and

5   security.   The Interim Guidelines require the amenities to be

6   "located in an integrated manner so they reasonably accommodate

7   the visitor."   Id., Exh. M at 9.   The Interim Guidelines

8   require, in addition to the other criteria for a HIRA, that the

9   HIRA "have been analyzed by regional fee boards and approved by

10  the appropriate line officer.   They will be reviewed for by

11  (sic) Recreation RACS when established."  Id., Exh. M at 9.   The

12  Interim Guidelines state that a HIRA may not be "an entire

13  administrative unit, such as a National Forest, but may include

14  a collection of recreation sites...."   Id., Exh. M at 10.

15  Additionally, the Interim Guidelines state that a fee "will not

16  be charged" "for general Forest/unit access, including charging

17  solely for parking or picknicking (sic) along roads or

18  trailsides."   Id., Exh. M at 7.   By choosing to promulgate

19  "Interim Guidelines", the Forest Service triggered the public

20  comment provisions of 36 C.F.R. § 216.

21          Despite the FLREA's express mandate regarding public

22

23          [9] The Interim Guidelines contain both a "definition" and a
24  "description" of a HIRA.  The language quoted supra is the description
    of a High-Impact Recreation Area in the body of the Interim
25  Guidelines.   Appendix A to the Interim Guidelines is titled
    "Definitions", and differs materially from the "description."   The
26  "definition" provides: **High Impact Recreation Area** (HIRA)- Clearly
    delineated areas that have clearly defined access points; that
27  experience concentrated recreation use; and that provide opportunities
    for outdoor recreation that are directly associated with a natural or
28  cultural feature, place, or activity."  Motion to Dismiss, Exh. M at
    22(App. A).

notice and comment, the Forest Service's own regulatory requirement regarding public comment, and the Interim Guidelines' statement that public notice and comment should be solicited in the establishment of a HIRA, neither the Coconino National Forest nor the Red Rock Ranger District provided the public with such an opportunity.  Notwithstanding the passage of over five years, there is no evidence in the record that a Resource Advisory Committee (RAC) was consulted or that public input was otherwise sought in the implementation of the plan to charge visitors the recreation amenity fee contemplated by the FLREA in the Red Rock HIRA, only an intent to do so at some undetermined time in the future.  See United States Supplemental Information at 8.

The Forest Service boldly asserts that although an agreement was struck with the BLM to utilize that agency's RACS in Arizona for the purpose of acquiring public input regarding the Arizona HIRA's, the Forest Service has not utilized those RACS because the Red Rock Pass program, in existence prior to the enactment of the FLREA, does not constitute the "establishment, modification or termination of recreation fees." The Forest Service argues that it is, therefore, exempt from the public participation requirements of section 6803.  See United States Supplemental Information at 4-8.  A cursory examination of the FLREA contradicts this contention.

Section 6812 of the FLREA specifically repealed the Fee Demo program, pursuant to which the collection of Red Rock Pass fees was authorized, and the funds collected pursuant to the authority of the Fee Demo program were placed into new accounts

established pursuant to the FLREA.  Additionally, section 6802(a) indicates that, beginning in fiscal year 2005 the Forest Service could "establish, modify, charge, and collect recreation fees" only as specified in the FLREA.

Furthermore, section 6802(b)(5) states that the Forest Service "shall" obtain input from the appropriate RACS as provided in section 6803(d).  Finally, 36 C.F.R. § 261.17 eliminated all reference to former § 261.15 restricting the Red Rock Pass to "use of a site, facility, equipment or service." And notably, pursuant to the inter agency agreement the BLM's Arizona RACs have volunteered to review the Forest Service Arizona HIRAs, and specifically the Red Rock HIRA, but to date the Forest Service has declined this offer.  See Defendant's Response to Court Order.  Although the name of the pass remains the same, the Red Rock Pass program is quite clearly the establishment of a new recreational fee pursuant to the FLREA.

On November 22, 2005, the Forest Service published a notice of action, i.e., a "final rule," in the Federal Register:

> This final rule is making minor, purely technical changes to implement the Federal Lands Recreation Enhancement Act (16 U.S.C. 6801-6814). *The Federal Lands Recreation Enhancement Act repealed and supplanted section 4 of the Land and Water Conservation Fund Act (16 U.S.C. 460l-6a) as the authority for special recreation permits issued by federal land management agencies and for recreation fees charged by federal land management agencies, including the Forest Service*. ... The final rule also is adding a definition for recreation fee and revising the prohibition for failure to pay recreation fees in 36 CFR part 261, subpart A, to conform with the Federal Lands Recreation Enhancement Act. In addition, the final rule is removing 36 CFR part 291 governing recreation fees authorized under section 4 of

-14-

1    the Land and Water Conservation Fund Act.
2    *Because these changes are minor, purely
     technical, and nondiscretionary, the
3    Department finds that good cause exists to
     exempt this rulemaking from public notice and
     comment under 5 U.S.C. 553(b)(B).*
4

5    70 F.R. 70496-01 at 70496 (2005) (emphasis added).

6        The notice in the Federal Register further states:

7        The Federal Lands Recreation Enhancement Act
         (REA) (16 U.S.C. 6801-6814) was enacted
8        December 8, 2004. REA provides the sole
         authority for the Forest Service to issue and
9        collect fees for special recreation permits
         for use and occupancy of National Forest
10       System lands and to establish, modify,
         charge, and collect recreation fees on
11       National Forest System lands. Section 813 of
         REA (16 U.S.C. 6812) repeals the agency's
12       other authorities for issuing these permits
         and charging these fees, including section 4
13       of the Land and Water Conservation Fund Act
         (LWCFA) (16 U.S.C. 460l-6a).
14

15   Id.[10]

16

17

18
     _____

19        [10] The agency's assertion that the changes to the legal system
     authorized by the FLREA were "minor, purely technical, and
20   nondiscretionary," is belied by the fact that it was necessary to
     alter the Code of Federal Regulations to remove the crime of failing
21   to pay for use of a site or facility, i.e., former section 261.15, and
     replace it with a section creating the much broader crime of failing
22   to pay a recreation fee, i.e., section 261.17. Prior to 2005, 36
     C.F.R. § 261.15 prohibited the failure to pay a fee for use of a site
23   or facility. This section was changed in 2005 to discuss off-road
     vehicles and a new section, 36 C.F.R. 261.17, now prohibits the
24   failure to pay a "recreation fee," which was not previously
     specifically prohibited by the regulations. As one commentator noted
     prior to passage of the FLREA:
25       While the Forest Service has no right to issue regulations
         to enforce Fee Demo, the agency relies on 36 C.F.R. §
26       261.15 to provide the authority to issue fines: "Failing to
         pay any fee established for admission or entrance to or use
27       of a site, facility, equipment or service furnished by the
         United states is prohibited. The maximum fine shall not
28       exceed $100." 36 C.F.R. § 261.15 (2001).
     Pfisterer, 22 J. Land Resources & Envtl. L. at n.197.

                              -15-

1          **IV Analysis**

2          Several questions present themselves in this matter,
3 including the origin and extent of the Forest Service's
4 authority to impose the subject fee on Mr. Smith's recreational
5 activity, and whether the Red Rock High Impact Recreation Area
6 is an "area" where an amenity fee may be charged.  A threshold
7 question to be answered first is whether a defendant may
8 challenge in his criminal prosecution the establishment of a
9 regulation, or in this matter a guideline established by an
10 agency.  The Ninth Circuit Court of Appeals has answered this
11 question in the affirmative.  See United States v. Mandel, 914
12 F.2d 1215, 1220-21 (9th Cir. 1990).

13          The only potential authority for charging Mr. Smith an
14 amenity fee for use of a National Forest, and the authority to
15 criminalize the failure to pay such a fee, is the authority
16 given to the Secretary of the Agriculture in the FLREA.  Any
17 authority previously granted by the Fee Demo Program legislation
18 was specifically repealed by the FLREA.  Accordingly, if
19 charging Mr. Smith an amenity fee is beyond the authority given
20 to the Secretary of Agriculture in the FLREA, then the fee is
21 ultra vires and criminalizing Mr. Smith's behavior under the
22 regulation is without authorization.  See United States v. Dang,
23 488 F.3d 1135, 1141 (9th Cir. 2007); United States v. Graham
24 Mortg. Co., 740 F.2d 414, 432 (6th Cir. 1984).  See also Mandel,
25 914 F.2d at 1220-21.

26          Mr. Smith's use of the National Forest was limited to
27 driving to and from a parking area on a dirt Forest Service
28 road, overnight parking at an undeveloped dirt parking area,

i.e., there were no toilet facilities, picnic tables, or trash receptacles at the parking area, and hiking into the forest on a trail, and camping for one night in a non-developed, dispersed site.  The government argues that the collection of a recreation amenity fee is authorized because the Vultee Arch Trailhead is within an "area" where an amenity fee may be charged pursuant to the authority of the FLREA.  The Court concludes that this is not a permissive construction of the relevant statutory language and the Court need not defer to the agency's construction of the term when determining if the fee is authorized.

There are federal court opinions suggesting that, in a criminal matter, the Court should never defer to agency interpretations of statutory terms because the criminal statute is administered by the Court rather than the agency.  <u>See</u> <u>Crandon v. United States</u>, 494 U.S. 152, 177, 110 S. Ct. 997, 1011 (1990) (Scalia, J., concurring).  However, where a Court does evaluate the applicability of agency interpretation certain key signs stand tall along the path traveled.

**A. Chevron analysis**

An agency's interpretation of a statutory term, in this matter the Forest Service's interpretation of the term "area," "qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27, 121 S. Ct. 2164, 2170-71 (2001).  If the agency's interpretation claiming deference was promulgated otherwise, i.e., by the

issuance of a guideline, an agency ruling letter, an opinion by an appellate board, the agency's interpretation of a particular statutory section may merit the more limited deference recognized in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 65 S. Ct. 161 (1944).  <u>See</u> <u>George Harms Constr. Co., Inc. v. Chao</u>, 371 F.3d 156, 161-62 (3d Cir. 2004) (concluding that a cabinet secretary's position, taken in the context of litigation, would be an informal interpretation not entitled to Chevron deference); <u>Madison v. Resources for Human Dev., Inc.</u>, 233 F.3d 175, 186 (3d Cir. 2000) (concluding that "informal agency interpretations are not binding" but are entitled to respect, under Skidmore, to the extent they are persuasive.).

In this matter Congress, via the FLREA, delegated authority to the Secretary of Agriculture to make rules carrying the force of law, i.e., to promulgate a regulation criminalizing the failure to pay an amenity fee, as authorized by the statute, in an "area" as that term is defined in the statute.  <u>See</u> 16 U.S.C. § 6811(d) (2000 & Supp. 2010);[11] 36 C.F.R. § 261.17.  The

_____

[11] This section of the FLREA provides in full:
(a) Enforcement authority
The Secretary concerned shall enforce payment of the recreation fees authorized by this chapter.
(b) Evidence of nonpayment
If the display of proof of payment of a recreation fee, or the payment of a recreation fee within a certain time period is required, failure to display such proof as required or to pay the recreation fee within the time period specified shall constitute nonpayment.
(c) Joint liability
The registered owner and any occupant of a vehicle charged with a nonpayment violation involving the vehicle shall be jointly liable for penalties imposed under this section, unless the registered owner can show that the vehicle was used without the registered owner's express or implied permission.
(d) Limitation on penalties

agency then chose to issue "guidelines" interpreting statutory terms, such as what constitutes an "area" where an amenity fee may be charged, and also informally, i.e., without public notice and comment, created from whole cloth a new species of administrative unit, i.e., "High Impact Recreation Areas", where an amenity fee could be charged.

The term "Chevron analysis" arose from the analysis set forth by the Supreme Court in <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S. Ct. 2778, (1984), as further explained in <u>Food & Drug Admininstration v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 120 S. Ct. 1291 (2000).[12]   When deciding if an agency's interpretation of a statutory term, such as "area" where an amenity fee may be charged, is permissible, <u>Chevron</u> requires the Court to first consider "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S. Ct. at 2781-82.  "If Congress has done so, the inquiry is at an end" and the Court "must give effect to the unambiguously expressed intent of

---

The failure to pay a recreation fee established under this chapter shall be punishable as a Class A or Class B misdemeanor, except that in the case of a first offense of nonpayment, the fine imposed may not exceed $100, notwithstanding section 3571(e) of Title 18.

[12] The federal courts ordinarily afford deference to federal agencies regarding the statutes and regulations they administer. The agency's presumed practical expertise is one of the principal justifications behind Chevron deference. <u>See</u>, <u>e.g.</u>, <u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833, 845, 106 S. Ct. 3245, 3253-54 (1986); <u>United States v. LaBonte</u>, 520 U.S. 751, 778, 117 S. Ct. 1673, 1687 (1997). "Courts generally defer to agency expertise when interpreting vague or incomplete statutes." <u>Johnson v. Apfel</u>, 191 F.3d 770, 774 (7th Cir. 1999), <u>quoting</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843, 104 S. Ct. 2778 (1984).

Congress." <u>Brown & Williamson</u>, 529 U.S. at 132, 120 S. Ct. at 1300-01.  In making that assessment the Court is to look not only at the precise statutory section in question, it must also analyze the provision in the context of the governing statute as a whole, presuming a Congressional intent to create a "symmetrical and coherent regulatory scheme." <u>Id.</u>, 529 U.S. at 133, 120 S. Ct. at 1301-02.

"If a court, employing traditional tools of statutory interpretation, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." <u>Chevron</u>, 467 U.S. at 843 n.9, 104 S. Ct. at 2782 n.9.  If the plain language of a statute renders its meaning reasonably clear, the Court should not investigate further unless the application of the plain language to the situation "leads to unreasonable or impracticable results." <u>United States v. Daas</u>, 198 F.3d 1167, 1174 (9th Cir. 1999), <u>quoted in United States v. Stephens</u>, 424 F.3d 876, 882 (9th Cir. 2005).  There is a "strong presumption" that "the plain language of the statute expresses congressional intent." <u>Ardestani v. Immigration & Naturalization Serv.</u>, 502 U.S. 129, 130, 112 S. Ct. 515, 516 (1991).  This presumption is "rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed." <u>Id.</u>

> The role of the courts in cases of statutory construction is to give effect to Congressional intent, <u>Negonsott v. Samuels</u>, 507 U.S. 99,[] (1993); to do more is to transgress the boundaries of the Articles of the Constitution and to engage ourselves as legislators rather than jurists, to allow ourselves to say what we think the law is, or ought to be, rather than what Congress has

1  told us it is. While this temptation hangs
2  always before the judiciary as a tantalizing
   fruit, it is to us constitutionally
3  forbidden. Because our concern is to carry
   out that which Congress has wrought, in
4  determining whether any action or situation
   falls within the borders of the class of
5  activities Congress intended to reach through
   statutory prohibition we begin with the words
6  of the statute itself, for if they are clear
   and unambiguous, the task of the courts is
   ended.
7

8  United States v. Hamrick, 43 F.3d 877, 893 (4th Cir. 1995).

9       Accordingly, the Court must reject an agency's

10  construction of a statute which is contrary to clear

11  Congressional intent or which frustrates the policy Congress

12  sought to implement via the statutory scheme. See Schneider v.

13  Chertoff, 450 F.3d 944, 952 (9th Cir. 2006).

14       Under the first step of the Chevron test, the Court

15  finds the statutory language completely clear with regard to the

16  extent of the authority conferred to charge a citizen a

17  recreational amenity fee. Congress expressed a manifest intent

18  in the FLREA that a fee not be charged solely to park on the

19  National Forest, or at a site where the six specific listed

20  "amenities" were not found. The FLREA is an extremely

21  comprehensive and precise statutory scheme clearly delineating

22  specific instances in which the public may be charged an amenity

23  fee for use of the National Forests, and other public lands, and

24  quite plainly prohibiting the agency from establishing any

25  system which requires the public to pay for parking or simple

26  access to trails or undeveloped camping sites.

27       The language of the statute which confers on the

28  Secretary the power to criminalize Mr. Smith's behavior states:

-21-

> The Secretary shall not charge any standard
> amenity recreation fee or expanded amenity
> recreation fee for Federal recreational lands
> and waters administered by the Bureau of Land
> Management, the Forest Service, or the Bureau
> of Reclamation under this chapter for any of
> the following:
> (A) Solely for parking, undesignated parking,
> or picnicking along roads or trailsides.
> (B) For general access unless specifically
> authorized under this section.
> (C) For dispersed areas with low or no
> investment unless specifically authorized
> under this section.
> ...
> (E) For camping at undeveloped sites that do
> not provide a minimum number of facilities
> and services as described in subsection
> (g)(2)(A) of this section.

16 U.S.C. § 6802(d)(1) (2000 & Supp. 2010).

If the Forest Service's construction of the term "area"
results in the situation where a citizen is charged a fee that
is clearly prohibited by the statute, i.e., to pay for parking,
for general access, or camping at undeveloped sites, the
enforcement of payment of the fee at a site within the "area"
where such a fee is prohibited by the statute is ultra vires in
that specific instance.   The plain language of the FLREA
provides that the Vultee Arch Trailhead parking lot is not an
"area" where an amenity fee may be charged.

The statute at issue, section 6802 provides:

> (f) Standard amenity recreation fee
> Except as limited by subsection (d) of this
> section, the Secretary may charge a standard
> amenity recreation fee for Federal
> recreational lands and waters under the
> jurisdiction of the Bureau of Land
> Management, the Bureau of Reclamation, or the
> Forest Service, but only at the following:
> (3) A destination visitor or interpretive
> center that provides a broad range of
> interpretive services, programs, and media.
> (4) An area--
> (A) that provides significant opportunities

-22-

for outdoor recreation;
(B) that has substantial Federal investments;
(C) where fees can be efficiently collected; and
(D) that <u>contains</u> <u>all</u> of the following amenities:
(i)  Designated developed parking.
(ii) A permanent toilet facility.
(iii)A permanent trash receptacle.
(iv) Interpretive sign, exhibit, or kiosk.
(v)  Picnic tables.
(vi) Security services.

(emphasis added).

The very plain language of the statute prohibits the Forest Service from charging a fee for entering, i.e., accessing, a National Forest.  The statute also clearly and specifically prohibits charging an amenity fee solely for parking a vehicle in an undeveloped parking lot.  It is apparent that Mr. Smith would not have received a ticket had he not parked a vehicle, i.e., had a friend delivered him to the trailhead and retrieved him the following day.  Accordingly, what Mr. Smith received was actually a ticket for parking, clearly prohibited by the plain language of the statute.

The FLREA also clearly prohibits the Forest Service from charging an amenity fee at an "area" where all six of the listed specific "amenities" are not provided.  The Forest Service's interpretation of the statutory language to authorize the charging of an amenity fee at the Vultee Arch Trailhead is contrary to the clear language of the relevant statute and, accordingly, the Forest Service is not authorized by the FLREA and indeed is prohibited by the FLREA from citing Mr. Smith for failing to pay the subject fee.  See <u>Christensen v. Harris County</u>, 529 U.S. 576, 588, 120 S. Ct. 1655, 1663 (2000)

-23-

1   ("deference is warranted only when the language of the

2   regulation is ambiguous"); <u>Joseph v. Holder</u>, 579 F.3d 827, 833

3   (7th Cir. 2009); <u>Bahramizadeh v. United States INS</u>, 717 F.2d

4   1170, 1173 (7th Cir. 1983) ("An agency may not interpret its

5   regulations in a manner so as to nullify the effective intent or

6   wording of a regulation.").

7             **B. Skidmore analysis**

8             The establishment of High Impact Recreation Areas and

9   the Red Rock HIRA were not traditional "rule making" as that

10  term is normally used in the context of Chevron.  The agency did

11  not establish the existence of High Impact Recreation Areas or

12  the Red Rock HIRA through means of notice to and accepting

13  comments from the public.  The agency's position, that the

14  statutory definition of an area where an amenity fee may be

15  charged includes the Vultee Arch Trailhead parking lot, which

16  position is taken in this litigation, could thus be considered

17  akin to a different form of "rule making" properly analyzed

18  under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 65 S. Ct. 161

19  (1944).[13]  The Supreme Court has stated that Chevron deference

20  applies only to "a formal adjudication or notice-and-comment

21  rulemaking," and does not apply to interpretations announced in

22  opinion letters, "policy statements, agency manuals, and

23  _____

24        [13] In general, federal agency "manuals", such as the Interim
    Guidelines, are not accorded Chevron deference.  <u>See</u> <u>Dickson v. Hood</u>,

25  391 F.3d 581, 590 & n.6 (5th Cir. 2004) ("Although not entitled to
    Chevron deference, relatively informal CMS interpretations of the

26  Medicaid Act, such as the State Medicaid Manual, are entitled to
    respectful consideration....); <u>Rabin v. Wilson-Coker</u>, 362 F.3d 190,

27  198 (2d Cir. 2004); <u>Indiana Family & Soc. Servs. Admin. v. Thompson</u>,
    286 F.3d 476, 480 (7th Cir. 2002) (noting that "[l]ess formal agency

28  interpretations, including those in agency manuals," should be
    accorded Skidmore deference).

-24-

enforcement guidelines, all of which lack the force of law ...."
Christensen, 529 U.S. at 587, 120 S. Ct. at 1663.

The Forest Service's interpretation of what constitutes an "area" where an amenity fee may be charged pursuant to the authority of the FLREA also fails under the test established by Skidmore.  The agency's interpretation of the relevant statutory term is entitled to deference only insofar as the interpretation has the power to persuade the Court, which is a function of the thoroughness evident in the agency's consideration of the issue and the validity of the agency's reasoning.  See Resident Councils of Wash. v. Leavitt, 500 F.3d 1025, 1037 (9th Cir. 2007).  The weight accorded to an administrative judgment "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  Skidmore, 323 U.S. at 140, 65 S. Ct. at 164.

The FLREA explicitly repealed the Fee Demo Program in order to address criticisms of that program.  Nonetheless, the result in the Red Rock Ranger District of the Coconino National Forest has been to maintain the same fee system as that in place under the Fee Demo Program.  See United States Supplemental Information at 4-5.  None of the Skidmore factors that weigh in favor of persuasion are present in this matter, i.e., there is no indication that the agency thoroughly considered where an amenity fee could or could not be charged, pursuant to the explicit terms of the new statutory scheme.

Nor is the agency's reasoning in favor of the latitude of the authority it purports to wield persuasive.  The Forest Service has interpreted section 6802(f) as allowing the agency, in the Red Rock HIRA, to combine multiple "areas" with or without amenities if, cumulatively, all required amenities can be found in the area, notwithstanding the size of the area or how far a visitor might have to travel to avail themselves of the amenity.   This is not persuasive logic.   The Interim Guidelines themselves do not support this construction of when an amenity fee may be charged by virtue of the presence of the statutorily-specific amenities, because the Interim Guidelines mandate that the amenities be "located in an integrated manner so they reasonably accommodate the visitor."   The trash receptacle closest to the Vultee Arch Trailhead parking area is approximately 10 miles away and the closest toilet facility is approximately 7 miles away.

The agency's argument that their interpretation of what an "area" is pursuant to the FLREA is permissible is predicated, at least in part, on a previous decision involving the Mt. Lemmon High Impact Area.  In that case the court stated:  "There is no stated limitation in the FLREA on the scope of an 'area.' Congress did not specifically authorize the Service to combine areas, nor did it prohibit the Service from combining areas." Wallace, 476 F. Supp. 2d at 1133.   The court, utilizing the Chevron analysis, based upon the record before it, held that the Forest Service could create HIRAs and that the Mt. Lemmon HIRA was appropriately established.  Id.   See also Sherer v. United States Forest Serv., ___ F. Supp. 2d ___, 2010 WL 2943275, at

*10 (D. Colo.).[14]

However, although Congress did not specifically limit the geographic size of an "area" in the FLREA, elsewhere in the same section of the legislation Congress expressed an intent to prohibit the Forest Service from charging citizens solely for parking at undeveloped parking sites or for casual use of remote sites, such as dispersed camping or hiking. Congress indicated an intent to not charge citizens an amenity fee for use of sites where six specific amenities were not provided. By prohibiting the Forest Service from charging the public simply for access and parking, and stating that the Forest Service could only charge an amenity fee at "areas" with amenities, Congress clearly intended to exclude from the definition of an "area" a place without amenities where the result would be that the public would be charged solely to park or for general access or undeveloped camping.

This Court's decision is not contradictory to Wallace because the factual situation and geographical situation involved in Wallace are not on "all fours" with this matter. In contrast to the Red Rock HIRA, the Mt. Lemmon HIRA involves a concise area accessed by a single, 26-mile long paved road, and approximately one-half mile of land adjacent to each side of the

_____

[14] Scherer was a civil Administrative Procedures Act suit brought to challenge the ten-dollar fee charged to access Mt. Evans and other trailheads in Colorado via Highway 5. The Colorado District Court concluded that the Forest Service's collection of a fee was a permissible construction of the authority granted by the FLREA. The geographic situation of the Mt. Evans amenity fee area, a 14-mile stretch of road with a single fee-collection booth at the bottom of the road and a single clustering of amenities at a visitor's center, is more similar to the Mt. Lemmon HIRA than the Red Rock HIRA.

26-mile long stretch of road. The entire Mt. Lemmon HIRA is, therefore, similar in size and accessability to the Oak Creek Canyon section of the Red Rock Ranger District. However, the Oak Creek Canyon section of the Red Rock HIRA is only a small portion of the greatly dispersed landscapes of the Red Rock HIRA at issue in this matter.

The Red Rock HIRA encompasses over 160,000 acres of land, approximately 250 square miles, which is nearly five times the size of the Mt. Lemmon HIRA. The Red Rock HIRA includes highly developed recreation areas such as Oak Creek Canyon, and very remote sites where recreational activity or cultural sites are broadly dispersed. The Mt. Lemmon HIRA is accessed at a single point where the amenity fee is paid, in contrast to the Red Rock HIRA, which is so vast that the amenity fee may be paid at 88 different collection points, including commercial vendors of the Red Rock Pass such as resorts, grocery stores, golf courses, car rental agencies, and gas stations.[15]

Accordingly, the geographic structure of the Mt. Lemmon HIRA, which is focused around a single 26-mile stretch of road, as contemplated by the Interim Guidelines,[16] is very

_____

[15] While perhaps convenient to the public, the Court questions whether such a system constitutes the efficient collection of fees as contemplated by the FLREA in order to qualify as an "area." See 16 U.S.C. § 6802(f)(4)(C). As the parties have not addressed this issue the Court need not resolve it.

[16] The "Definitions" section of the Interim Guidelines states that HIRAs are "[c]learly delineated areas that have clearly defined access points; that experience concentrated recreation use; and that provide opportunities for outdoor recreation that are directly associated with a natural or cultural feature, place, or activity." Motion to Dismiss, Exh. M, App. A. As quoted in the body of the text supra, the "description" of a HIRA is

-28-

distinguishable from the Red Rock HIRA, which encompasses not only the single road through Oak Creek Canyon but also portions of three Wilderness Areas more than twenty miles distant, and separated from Oak Creek Canyon by, *inter alia*, the municipality of Sedona and transected by State Highway 89A running north to south.   Accordingly, although the Mt. Lemmon HIRA might logically be considered an "area" containing the statutorily required amenities for which the agency may charge a fee, such a conclusion does not compel a similar conclusion, that the 160,000 acre Red Rock HIRA, which results in the payment of fees for amenities which are greatly distant to the user, is a logical construction of the relevant statutory language.

In addition to the plain language of the statute prohibiting the Forest Service from charging for parking or access or undeveloped camping, and the plain language of the statute prohibiting the Forest Service from charging an amenity fee at a site where specific amenities were not provided, Congressional intent and legislative history indicate that the Forest Service's construction of the relevant statutory section would thwart Congressional intent and result in an absurd construction of the relevant statutory scheme.   Accordingly, the agency's interpretation of the statute is not persuasive.

---

a clearly delineated, contiguous area with specific, tightly defined boundaries and clearly defined access points (such that visitors can easily identify the fee area boundaries on the ground or on a map/sign); that supports or sustains concentrated recreation use; and that provides opportunities for outdoor recreation that are directly associated with a natural or cultural feature, place, or activity (i.e., waterway, canyon, travel corridor, geographic attraction, the recreation attraction).

        The legislative history of the FLREA indicates that
Congress evaluated a concern that citizens would be charged a
fee for simple access to federal lands.   The legislative history
and resulting statutory language indicate that Congress intended
to make some changes to the Fee Demo Program which was widely
criticized.

        In 2004 Congressman Richard Pombo of California offered
an amendment in the nature of a substitute that made a number of
changes to the original text of the FLREA.    The amendment
clarified where a fee may and may not be charged. This section
of the amendment was considered overly prescriptive specifically
to alleviate the concerns of citizens and legislators who
distrusted the federal land management agencies with the
recreation fee authority. For example, the amendment made clear
that the Forest Service and the Bureau of Land Management would
not be permitted to charge solely for parking and the use of
scenic pullouts and other non-developed areas because such a fee
was in essence an entrance fee, while the National Park Service
and the Fish and Wildlife Service may continue to charge an
entrance fee for use of units within these systems.    See H.R.
Rep. No. 108-790(I), H.R. Rep. No. 790(I), 108th Cong., 2d Sess.
2004 (2004 WL 2920863).

        Neither is the Forest Service's delineation of the Red
Rock HIRA in accordance with its own Interim Guidelines--the Red
Rock HIRA does not fit either the "description" or the
"definition" of a HIRA contained in the Guidelines.    The Red
Rock HIRA is not a clearly delineated, contiguous area with
specific, tightly defined boundaries.   The Red Rock HIRA sprawls

across 160,000 acres and includes portions of three different wilderness areas, the Munds Mountain Wilderness Area, the Red Rock Secret Mountain Wilderness Area, and the Sycamore Canyon Wilderness Area, within its boundaries.   The boundaries of the HIRA wind in and out of steep canyons without clear delineation, contrary to the Interim Guidelines' requirement that visitors be able to easily identify the fee area boundaries on the ground or on a map.   Additionally, the HIRA is not contiguous, being comprised of not only National Forest lands, but encompassing lands under the administration of the Bureau of Land Management, the State of Arizona (including a state highway and state parks such as Slide Rock State Park), Coconino County, Yavapai County, the City of Sedona, the Village of Oak Creek, and extensive islands of private land of irregular shape and size.

Accordingly, using either a Chevron analysis or giving "Skidmore deference" to the agency's interpretation of the extent of the authority granted by the FLREA to charge amenity fees, the Forest Service's interpretation of the FLREA to allow for the charging of an amenity fee at the Vultee Arch Trailhead is not a permissive construction of the statutory language or the authority conveyed to the agency in the FLREA.

**C. Rule of Lenity**

Mr. Smith urges that the rule of lenity be applied to his prosecution.   Whether construed under the rule of lenity or pursuant to a due process analysis the end result is the same.

"A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the rule in

question." <u>United States v. Hogue</u>, 752 F.2d 1503, 1504 (9th Cir. 1985). <u>See also</u> <u>Dunn v. United States</u>, 442 U.S. 100, 112, 99 S. Ct. 2190, 2197 (1979). In this matter, although the FLREA statutes which criminalize the failure to pay the required recreational fee are clear, the Forest Services' assembly of the patchwork quilt comprising the Red Rock HIRA, which is inconsistent with FLREA and the agency's own Interim Guidelines, would not place a person of ordinary intelligence on fair notice as to whether his or her conduct was criminal.

## V. Conclusion

The Forest Service is authorized to charge a recreational amenity fee in areas which meet the statutory definition of an "area" provided in the FLREA. The Forest Service is specifically prohibited from charging a recreational amenity fee at sites or for uses where charging a recreational amenity fee is specifically prohibited. Although the Forest Service may create HIRAs, the Forest Service's determination that charging a recreational amenity fee anywhere within the Red Rock HIRA is authorized by the FLREA because the entire HIRA is an "area" where such a fee may be charged is contrary to the clear statutory language of the FLREA. Accordingly, citing Mr. Smith for failure to pay a recreation fee when requiring Mr. Smith to pay a recreation fee at the place cited and for the activity cited was ultra vires, i.e., not authorized by the FLREA and the citation must be dismissed. However, dismissing this citation is not the death knell of the Red Rock Pass program. The record before the Court reveals numerous recreation sites and locations within the Red Rock HIRA which

qualify as "areas" and where charging a recreational amenity fee would not violate the other provisions of the FLREA.   Assuming an individual's recreational activities were not exempted from the uses for which no fee may be charged, requiring a Red Rock Pass for use of those areas would be appropriate.

Accordingly,

**IT IS ORDERED dismissing** the citation with prejudice.

DATED this 14th day of September, 2010.

_____
Mark E. Aspey
United States Magistrate Judge

-33-